IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>STEVEN PYEATT,<br><br>        Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:05-CR-890 TC |

      Defendant Steven Pyeatt has been indicted on one count of possession of a list I chemical (phosphorus) with knowledge or reason to believe that it was to be used to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c). Pyeatt filed a Motion to Suppress evidence obtained by the government during a warrantless search.

      Specifically, Pyeatt challenges a January 25, 2005 warrantless search of an apartment where Pyeatt, a parole fugitive at the time, was found and questioned by Utah Adult Probation and Parole agents. He contends that his Fourth and Fifth Amendment rights were violated because the agents (despite their warrant for his arrest) did not have legal justification to forcibly enter the apartment (allegedly leased to a third party), seize him, search the apartment, and question him. According to Pyeatt, because the initial entry was unlawful, all subsequent actions were unlawful and evidence obtained was fruit of the poisonous tree.

      In response, the government contends that Pyeatt does not have Fourth Amendment standing to contest the entry and search of the apartment. The government also contends that the

parole agents had the requisite authority (an arrest warrant and parole agreement), exigent circumstances, reasonable suspicion and consent (verbally or in written parole agreement) to enter the apartment, seize Pyeatt, search the apartment for weapons and evidence of parole violations, and question him.

For the reasons set forth below, the court DENIES Defendant Steven Pyeatt's Motion to Suppress.

## FINDINGS OF FACT[1]

The events that give rise to Pyeatt's Motion to Suppress occurred on January 25, 2005. But in order to understand the legal implications of those events, one must understand the events leading up to that day.

**Background**

In April 2004, Steven Pyeatt, upon his conditional release from prison, signed a Parole Agreement with the Utah State Board of Pardons and Parole. (See Pl.'s Ex. 1 (as amended on October 29, 2004).) In the Parole Agreement, he agreed to be directed and supervised by Adult Probation and Parole ("AP&P") and agreed to abide by certain conditions of his parole, including the following:

> 2.  ABSCONDING:   I will not abscond from parole supervision. A–Reporting: I will report as directed by the Utah Department of Corrections. B–Residence: I will establish and reside at a residence of record and will not change my residence

---

[1]Unless otherwise noted, the facts are taken from the testimony presented during the March 9, 2006 evidentiary hearing on Mr. Pyeatt's Motion to Suppress. (See Transcript of Mar. 9, 2006 Evidentiary Hearing on Motion to Suppress ("Tr.").)

|   |   |   |
|---|---|---|
|   |   | without first obtaining permission from my AP&P Officer. C–Leaving the State: I will not leave the state of Utah, even briefly, . . . without prior permission from my AP&P Officer. . . . |
| 4. | HOME VISITS: | I will permit visits to my place of residence by officers of Adult Probation and Parole for the purpose of ensuring compliance with the conditions of my parole.  I will not interfere with this requirement: i.e. having vicious dogs, perimeter security doors, refusing to open the door, etc. |
| 5. | SEARCHES: | I will permit officers of Adult Probation and Parole to search my person, residence, vehicle or any other property under my control without a warrant at any time, day or night, upon reasonable suspicion to ensure compliance with conditions of my parole. . . . |

(Id. at 1.)

Pyeatt's residence of record was his mother's house on Beechwood Road in Taylorsville, Utah. Often he stayed in a trailer next to his mother's house, and some of his belongings were stored in the house or the trailer.

On November 30, 2004, Pyeatt reported to the AP&P office and provided a urine sample which tested positive for marijuana and methamphetamine. Later that day, AP&P Agents Mike Renckert and Jason Lunnen (who was Pyeatt's supervising agent) visited Pyeatt at the Beechwood residence. They noted some parole violations and, as a result, ordered Pyeatt to report again to the AP&P office. But this time Pyeatt did not show up. For weeks after Pyeatt's failure to report, Agents Renckert and Lunnen unsuccessfully tried to contact him, particularly through visits to the Beechwood house.

Lunnen and Renckert, despite numerous visits to Pyeatt's Beechwood address, were unable to find him. Indeed, Pyeatt's mother, who lives in the Beechwood house, told the agents

during their visits that she had not seen her son.  And Pyeatt's truck was not parked there when the agents visited.  They also "hit most of [Pyeatt's] old haunts" (Tr. at 5), but still were unable to find him.

On January 12, 2005, the Board of Pardons and Parole determined that Pyeatt (who was still nowhere to be found) had violated certain terms and conditions of his parole.  The Board issued a warrant for his arrest based on alleged violations of his Parole Agreement, including absconding from parole supervision.  (See Pl.'s Ex. 2.)  The AP&P agents continued to look for Pyeatt.

**Events of January 25, 2005**

On January 25, 2005, the agents received a tip about Pyeatt's location from an informant named Danny Burke.  According to Agent Renckert, Burke said that Pyeatt was living in an apartment complex in the area of 3300 South in South Salt Lake.  Burke had been to the apartment but he could not remember the specific location.  Instead, he described the area where the apartment complex was located and said that if the agents found Pyeatt's truck, the truck's location would indicate the apartment where Pyeatt was living.

That day, after driving through parking lots of various apartment complexes in the area described by Burke, Agents Renckert and Lunnen spotted Pyeatt's truck (they were familiar enough with Pyeatt's truck to positively identify it on sight).  The truck was parked in the parking lot of an apartment complex located at 3335 South 436 East in South Salt Lake. The parking stall was assigned to Apartment 6.

The agents went to Apartment 6 and knocked on the door.  Pyeatt opened the blinds and

looked through the window at the agents.[2]  Lunnen testified that Pyeatt

> kind of motioned and did a little wave.  And Supervisor Renckert told him, "It's AP&P.  Open the door now."  [Pyeatt] motioned, you know, kind of like an "Okay, I will," type thing.  And the blinds shut and the deadbolt locked.

(Tr. at 35.)  Then the agents heard someone running away from the door.  They believed the person running was Pyeatt.  Renckert identified himself again and kicked the door in.  Lunnen ran around to the back to prevent Pyeatt from escaping through a back door or window.

Upon kicking the door down, Renckert went into the apartment, where he found Pyeatt trying to climb through a bedroom window.  When Lunnen heard Renckert yelling, he went back to the front door and into the apartment.  Renckert had Pyeatt in custody.

After handcuffing Pyeatt, the agents searched the apartment for weapons and then conducted a more thorough search.  They found, among other things, receipts for payment of December 2004 and January 2005 rent (for Apartment 6) by Pyeatt,[3] a payroll check issued to Pyeatt on December 29, 2004, a bank statement for Pyeatt's checking account at U.S. Bank,[4] and Pyeatt's resume.[5]  Pyeatt's drum set was also in Apartment 6.

---

[2]At the hearing, Pyeatt denied going to the door.  The court did not find Pyeatt credible.  Accordingly, the court accepts the agents' testimony that Pyeatt went to the door and looked through the window.

[3]The receipts acknowledged payment of December 2004 rent by "Steve" and payment of January 2005 rent by "Steve Jenson" (a known alias of Pyeatt).  (See Pl.'s Ex. 3; Tr. at 15, 58.)  Later, the assistant manager for the apartment complex identified Pyeatt as the person to whom he issued receipts for payment of rent for Apartment 6.

[4]The bank statement (for the period November 19, 2004 through Dec. 17, 2004) was addressed to Pyeatt at his Beechwood address.  (See Pl.'s Ex. 3.)  But the agents found it in a box in Apartment 6.  (Tr. at 14-15.)

[5]The resume listed Pyeatt's address as 4521 Beechwood Road (his mother's house in Taylorsville).  (See Pl.'s Ex. 3.)  But, again, it was found in a box in Apartment 6.  (Tr. at 14-15.)

The agents also gave Pyeatt a <u>Miranda</u> warning. Pyeatt waived his right to remain silent and have an attorney present during questioning and answered the agents' questions.

**CONCLUSIONS OF LAW**

Pyeatt filed a motion to suppress, contending that the AP&P agents' entry into Apartment 6 was illegal and so the subsequent search, detention, and questioning were unlawful.

**<u>Mr. Pyeatt has standing</u>**.

The government first challenges Mr. Pyeatt's standing to object to the search of Apartment 6.[6] The United States relies solely on <u>United States v. Randolph</u>, 210 F. Supp. 2d 586 (E.D. Penn. 2002), to support its argument.

In <u>Randolph</u>, the District Court for the Eastern District of Pennsylvania held, as a matter of first impression, that a halfway-house fugitive did not have any Fourth Amendment protection against unreasonable searches. The district court analogized the defendant's status to that of an inmate, noting that "it does seem more than a little odd to suggest that the law should, in effect, give inmates constitutional rewards for fleeing their fetters." <u>Id.</u> at 590.

The court declines to follow <u>Randolph</u>. First, Pyeatt's case is factually distinguishable from <u>Randolph</u>, because Pyeatt's status as a parolee afforded him some Fourth Amendment protection before he absconded. Second, the issue in <u>Randolph</u> was one of first impression in a case that has no precedential value for this court. Finally, the Third Circuit Court of Appeals, in an unpublished opinion affirming the result of the lower court's decision, declined to reach the

---

[6]Pyeatt's standing to challenge the lawfulness of his detention and the admissibility of his incriminating statements is not questioned.

issue. Instead, the appellate court assumed the defendant had the same level of Fourth Amendment rights as a probationer and found that reasonable suspicion validated the warrantless search. See United States v. Randolph, 80 Fed. Appx. 190, 192-93 (3d Cir. Oct. 20, 2003) (citing United States v. Knights, 534 U.S. 112 (2001)).

Pyeatt has Fourth Amendment standing if he had a legitimate expectation of privacy in Apartment 6 at the time of the search. Minnesota v. Olson, 495 U.S. 91, 95 (1990). He bears the burden of establishing standing and must demonstrate that he had a subjective expectation of privacy in Apartment 6 that society is prepared to recognize as reasonable. United States v. Conway, 73 F.3d 975, 979 (10th Cir. 1995).

Pyeatt has established that, at a minimum, he was an overnight guest at Apartment 6. He had permission to be there, had regular access, kept his drum set and other possessions there, and treated it as a "hangout" where he spent time with his girlfriend. See Minnesota v. Olson, 495 U.S. at 96-97 (holding that overnight guest in duplex had standing to challenge search); United States v. Rhiger, 315 F.3d 1285, 1285-87 (10th Cir. 2003) (holding that defendant was social guest who had Fourth Amendment standing because defendant had permission to be at house, maintained a regular presence in house, stayed overnight on occasion, kept receipts in house, and entered house unannounced to take nap on day of search). Pyeatt had an expectation of privacy in Apartment 6 and, accordingly, has standing to challenge the agents' search of Apartment 6.

**The Agents' warrantless entry was lawful.**

    **The arrest warrant gave the AP&P authority to enter Apartment 6.**

Pyeatt contends that the agents' entry into Apartment 6 without a search warrant violated his Fourth Amendment rights and tainted the subsequent search and questioning. He relies on

7

Steagald v. United States, 451 U.S. 204 (1981), to support his position.

According to Pyeatt, Steagald stands for the proposition that "to enter a third person's home to arrest the named person, officers must first acquire a search warrant. Entry into and search of a third person's home based solely on an arrest warrant for a non-resident individual is unconstitutional." (Def.'s Mem. Supp. Mot. Suppress at 5 (internal citations omitted).) This is technically correct, but Steagald does not apply in this particular case.

In Steagald, the individual challenging the warrantless entry was the owner of the house, not the individual named in the arrest warrant. The United States Supreme Court resolved the specific question of "whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances." 451 U.S. at 212 (emphasis added). The Court emphasized that it addressed a very narrow issue in the case:

> [We recognize] that rights such as those conferred by the Fourth Amendment are personal in nature, and cannot bestow vicarious protection on those who do not have a reasonable expectation of privacy in the place to be searched. The issue here . . . is not whether the subject of an arrest warrant can object to the absence of a search warrant when he is apprehended in another person's home, but rather whether the residents of that home can complain of the search.

Id. at 219 (internal citation omitted). Indeed, the Steagald Court noted that, in Payton v. New York, 445 U.S. 573 (1980), it

> recognized that an arrest warrant was sufficient to authorize the entry into a person's home to effect his arrest. [The Payton Court] reasoned [that] "[i]f there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Because an arrest warrant authorizes the police to

8

> deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home.

Steagald, 451 U.S. at 214 n.7 (quoting Payton v. New York, 445 U.S. at 602-03)).

Pyeatt's position is internally inconsistent. He attempts to distinguish Payton by contending that he did not live in Apartment 6 and so the arrest warrant did not provide authority to enter Apartment 6. He then relies on Steagald and asserts Fourth Amendment rights that are only recognized by the courts if the challenging party (that is, Pyeatt) lives in the apartment.

The Third Circuit, in United States v. Agnew, 385 F.3d 288 (3d Cir. 2004),[7] addressed a similar situation and articulated the issue very well:

> We note that Payton only addresses entry by officers into the residence of the subject of the warrant, and that there was no testimony at the suppression hearing about whether 2740 Ludwig Street was [defendant] Agnew's residence. However, whether the home was Agnew's residence is ultimately irrelevant because under any of the possible alternatives the entry pursuant to the arrest warrant did not violate Agnew's Fourth Amendment rights.
>
> If Agnew resided at 2740 Ludwig Street, his arrest was lawful under Payton because the police acted pursuant to an arrest warrant. If Agnew did not reside at 2740 Ludwig Street, he may have lacked a privacy interest in the residence and would have no standing to challenge the police officers' entry. In any event, even if Agnew, although not a resident at 2740 Ludwig Street, did have a privacy interest, the entry did not violate his privacy rights. The Supreme Court held in Steagald v. United States that the Fourth Amendment does not permit police to enter a third person's home to serve an arrest warrant on a suspect. But Steagald protected the interests of the third-party owner of the residence, not the suspect himself. . . . As the Ninth Circuit observed[, "a] person has no greater right of privacy in another's home than in his own. . . ."
>
> Thus, even if Agnew was a non-resident with a privacy interest, the Fourth Amendment would not protect him from arrest by police armed with an arrest warrant.

---

[7]Agnew was reversed and remanded on unrelated grounds. See 534 U.S. 1136 (2005).

9

385 F.3d at 291 (internal citations omitted; emphasis added).

To satisfy the requirements of Payton, the government must show that the agents had a reasonable belief that Pyeatt lived in Apartment 6 and was in there at the time of the entry. United States v. Gay, 240 F.3d 1222, 1226 (10th Cir. 2001) (setting forth two-prong test). "Reasonable belief" is a more lenient standard than the "reasonable suspicion" standard set forth in Terry v. Ohio, 392 U.S. 1 (1968). Id. at 1227.  The belief must be objectively reasonable given the totality of the circumstances, and should be evaluated by looking at "the facts and circumstances within the knowledge of the law enforcement agents" at the time of the entry. Valdez v. McPheters, 172 F.3d 1220, 1225-26 (10th Cir. 1999).  The agents' belief "need not prove true in fact." Gay, 240 F.3d at 1227 (quoting Valdez, 172 F.3d at 1224-25).

The record clearly establishes the agents' reasonable belief that Pyeatt was in Apartment 6 at the time of the entry.  The AP&P agents, both of whom knew Pyeatt by sight based on their previous dealings with him, unequivocally testified that they saw Pyeatt look at them through the window before they entered.  Compare Gay, 240 F.3d at 1227 (to establish reasonable belief that arrestee is within the residence, the "officers are not required to actually view the suspect on the premises"). Accordingly, the only other issue is whether the agents reasonably believed that Pyeatt lived in Apartment 6.

Pyeatt asserts that the agents did not have a reasonable belief that Pyeatt lived in Apartment 6 because nothing in the record supports a belief that he changed his residence of record under the Parole Agreement.  But the officers need not believe that Pyeatt had established Apartment 6 as his new residence of record.  The case law does not support such a narrow interpretation of the requirement.  For example, the Tenth Circuit found that a police informant's

tip that the defendant lived in a particular house was sufficient to establish an objectively reasonable belief on the officers' part. Id. at 1226.

Looking at what the agents knew at the time of entry, the court finds that they held an objectively reasonable belief that Pyeatt was living in Apartment 6. Their informant told them that Pyeatt was living there. Renckert testified:

> [T]he information [from Danny Burke, the informant] was that [Pyeatt] was living there, but he said – the person that provided the information wasn't sure which apartment building or complex [the apartment] was in. He said – he gave us a general area, said, "This guy is living there. If you find his truck, that's the apartment he's living in." Because the person who gave us the information basically said he's been to the apartment. He's seen – he saw everything in the apartment.

(Tr. at 18-19 (emphasis added).) Pyeatt's mother repeatedly told the officers that she had not seen him. Neither Pyeatt nor his truck was at the Beechwood house when the agents visited. And they found Pyeatt's truck parked in the spot assigned to Apartment 6.[8]

Pyeatt's Fourth Amendment rights were not violated when the AP&P agents forcibly entered Apartment 6.[9]

---

[8]The information the agents received after they searched the apartment, such as receipts for payment of rent, is not relevant to a determination of whether they reasonably believed Pyeatt was living in Apartment 6. What is relevant is what the agents knew at the time of entry.

[9]Alternatively, even if Steagald applies instead of Payton, the court finds that exigent circumstances justified the agents' entry into Apartment 6. See Steagald, 451 U.S. at 205-06 (entry without search warrant does not violate Fourth Amendment rights if exigent circumstances existed). As soon as Pyeatt learned the identity of the agents, he locked the door and fled. The agents, who had a valid arrest warrant and were actively looking for Pyeatt, entered the house to prevent Pyeatt's escape through a back door or window. See Minnesota v. Olson, 495 U.S. 91, 100 (1990) ("'a warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence, or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling'") (emphasis added; internal citations omitted); United States v. Santana, 427 U.S. 38, 41-43 (1976) (noting that warrantless entry while in "hot pursuit" of suspect did not violate Fourth Amendment rights); United States

**The Parole Agreement gave agents authority to enter Apartment 6.**

In the Parole Agreement, Pyeatt agreed to warrantless searches of his person, residence, vehicle, and any other property under his control if the AP&P officers have reasonable suspicion of a parole violation. (See Pl.'s Ex. at ¶ 5.) The government contends that this condition of Pyeatt's parole gave the AP&P agents authority to enter and search Apartment 6.

The court finds that if the agents had authority under the Parole Agreement to search Apartment 6, they had implied authority to enter Apartment 6 to conduct the search. And, as discussed below, the agents had authority to search Apartment 6 because (1) it was property under Pyeatt's control and (2) they had reasonable suspicion of a parole violation. Accordingly, the agents had authority under the Parole Agreement to enter Apartment 6.

**The Agents' Search Was Lawful**.

After the agents entered Apartment 6, they did a search for weapons and then searched for evidence of parole violations. Pyeatt does not challenge the weapons sweep, but he does contend that the search for evidence was unlawful.

**"Residence" or "Any Other Property Under [Pyeatt's] Control"**

In particular, Pyeatt asserts that Apartment 6 does not fall within the definition of "residence" or "any other property under [his] control," as set forth in the Parole Agreement. (See Ex. 1 at ¶ 5.)

"Residence"

He contends that his "residence" at the time was the Beechwood address (his "residence

---

v. Aquino, 836 F.2d 1268, 1271 (warrantless entry "justified by suspect's flight, which frustrates police efforts to make a legitimate warrantless arrest").

of record"). The Parole Agreement, which gives AP&P agents authority to conduct a warrantless search under certain circumstances, does not define "residence." Pyeatt asserts that "residence" must be interpreted as "residence of record." But he does not present any case law to support his narrow interpretation of the agreement's language. And although the agreement requires Pyeatt to maintain a "residence of record," that language does not limit the word "residence" in paragraph 5 to Pyeatt's "residence of record."

Here, the evidence of rent receipts, the tip from the informant,[10] Pyeatt's disappearance from his mother's home, the fact that his drum set was stored in the apartment, and the fact that his truck was parked in the Apartment 6 parking space is sufficient to support a finding that Apartment 6 was Pyeatt's residence at the time of the search for purposes of the Parole Agreement.

### "Any Other Property Under [Pyeatt's] Control"

Even if Apartment 6 was not Pyeatt's "residence," it was other property under his control. Pyeatt contends that "any other property" refers to personal property only. The court disagrees.

Pyeatt does not present any case law to support his contention that the "any other property" clause necessarily refers to personal, as opposed to real, property. And the Parole

---

[10]The court disagrees with Pyeatt's suggestion that the informant was not reliable. (See Def.'s Reply at 4 ("The Court has no information about the reliability of this informant").) First, the informant was not anonymous and was presumably accountable if the information he provided was fabricated. Second, the informant's tip was based on personal knowledge and was relatively detailed. See United States v. Tucker, 305 F.3d 1193, 1200-01 (10th Cir. 2002) (holding that known citizen-informant's detailed tip (based on hearsay) of illegal activity was sufficient to establish reasonable suspicion under parole agreement); United States v. Gay, 240 F.3d 1222, 1227 (10th Cir. 2001) (holding that tip from confidential informant who had face-to-face discussion with officers and who told officers location of dwelling based on personal knowledge was sufficient to establish reasonable belief that arrestee lived in residence).

Agreement does not define the term "any other property," so it does not provide any authority for Pyeatt's reading.

Also, because Pyeatt has standing to contest the search of Apartment 6 on January 25, 2005, he clearly had some control over the space at the time. Indeed, he exercised literal control by locking the door when the agents arrived with their arrest warrant. This is sufficient to justify the agents' search, as long as they had reasonable suspicion of a parole violation.

### Reasonable Suspicion

The warrantless search of Apartment 6 was justified because the AP&P agents had reasonable suspicion that Pyeatt had violated conditions of his parole. See United States v. Tucker, 305 F.3d 1193, 1199 (10th Cir. 2002) (holding that warrantless search conducted pursuant to valid parole agreement was justified if it was supported by reasonable suspicion). (See also Pl.'s Ex. 1 at ¶ 5 (consenting to warrantless search supported by reasonable suspicion).) According to the Tenth Circuit:

> "Reasonable suspicion is a less demanding standard than probable cause." While probable cause means "a fair probability that contraband or evidence of a crime will be found," reasonable suspicion is merely a particularized and objective basis for suspecting criminal activity. To determine whether the investigating officers had reasonable suspicion, we consider both the quantity of information possessed by law enforcement and its reliability. Both factors must be viewed under the totality of circumstances.

Tucker, 305 F.3d at 1200 (internal citations omitted).

The court concludes that, based on the totality of the circumstances, the parole search was supported by reasonable suspicion. The agents had an arrest warrant issued by the Board of Pardons based on evidence that Pyeatt had violated various conditions of parole by, among other

things, using marijuana and methamphetamine[11] and absconding from parole supervision.  Also, Pyeatt's disappearance from the Beechwood address and the tip from Danny Burke that Pyeatt was living in Apartment 6 gave them reasonable suspicion that Pyeatt had changed his residence without informing AP&P (another violation of his parole conditions).

In short, the agents had authority to search Apartment 6 under the Parole Agreement because the apartment was, at a minimum, property under Pyeatt's control and the agents had reasonable suspicion of a parole violation.  Accordingly, the search was lawful and Pyeatt's motion to suppress evidence obtained during the search is denied.

**The Agents' Detention and Questioning of Pyeatt and Pyeatt's Waiver of His Right to Remain Silent**

Pyeatt challenges the admissibility of incriminating statements he made to the agents during his detention in Apartment 6.  Specifically, he contends that his waiver of the right to remain silent and have an attorney present during questioning was tainted by the illegal entry, so his statements are inadmissible as fruit of the poisonous tree under Wong Sun v. United States, 371 U.S. 471 (1963).  Because the court finds that the entry and search were lawful, it follows that the agents' detention and questioning of Pyeatt, and Pyeatt's waiver, were not tainted.  Accordingly, Pyeatt's motion to suppress his incriminating statements to the agents is denied.

---

[11]Pyeatt had a drug abuse problem for which he received treatment, and Agent Lunnen suspected that Pyeatt had relapsed.  (See Pl.'s Ex. 1 ¶ 12; Tr. at 27, 36-38.)

**ORDER**

For the foregoing reasons, Defendant Steven Pyeatt's Motion to Suppress Evidence is DENIED.

DATED this 15th day of June, 2006.

BY THE COURT:

TENA CAMPBELL
United States District Judge